1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8   Megan M. Spencer,

9                          Plaintiff,            No. CV 23-01604 PHX DWL (CDB)

10  v.
                                                 **REPORT AND**
11  Commissioner of Social Security              **RECOMMENDATION**
    Administration,
12
                           Defendant.
13

14  **TO THE HONORABLE DOMINIC W. LANZA:**

15          This case was referred to the Magistrate Judge for preparation of a report and

16  recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) and

17  Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for the District of Arizona.

18          **I.      Procedural Background**

19          Spencer filed applications for Title II Social Security disability insurance benefits

20  and Title XVII disability benefits on October 26, 2020, alleging she became disabled on

21  October 21, 2020. (ECF No. 12-6 at 6-16). Spencer's claim was denied initially on June

22  4, 2021. (ECF No. 12-4 at 28, 40). Her claim was denied upon reconsideration on

23  February 3, 2022. (ECF No. 12-4 at 52, 64). Spencer requested a hearing before an

24  Administrative Law Judge ("ALJ"), which was conducted August 4, 2022. (ECF No. 12-

25  3 at 53-69). Spencer was represented by a non-attorney advocate at the hearing. (*Id. See*

26  *also* ECF No. 12-5 at 21).[1] In an order entered September 12, 2022, the ALJ determined

27  _____

28          [1] During the hearing the ALJ referred to Spencer's advocate as "counsel," but in the
    Claimant's Appointment of a Representative both Spencer and her advocate, Mr. Mace, aver he
    is a "non-attorney." (ECF No. 12-5 at 21).

Spencer was not disabled through the date of that decision. (ECF No. 12-3 at 36). Spencer sought review of the ALJ's decision by the Social Security Appeals Council, which denied review on June 7, 2023 (ECF No. 12-3 at 2-4), making the ALJ's decision the final, reviewable decision of the Commissioner.

## II.    Governing Law

Spencer seeks disability benefits pursuant to Title II and Title XVII of the Social Security Act. Disability insurance benefits pursuant to Title II are paid to disabled persons who have contributed to the Social Security program regardless of financial need. 42 U.S.C. §§ 401-425. Title XVI Supplemental Security Income ("SSI") benefits are paid to disabled "financially needy individuals," regardless of their insured status. 42 U.S.C. §§ 1382-1383; *Smith v. Berryhill*, 139 S. Ct. 1765, 1771-72 (2019). Under both programs disability is defined as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(a).

To establish eligibility for benefits based on disability, the claimant must show they suffer from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months, and the impairment renders the claimant incapable of performing the work they previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. 20 C.F.R. § 404.1505. If a claimant meets both of these requirements, they are by definition "disabled." *See*, *e.g.*, *Frost v. Barnhart*, 314 F.3d 359, 365 (9th Cir. 2002). To be entitled to disability insurance benefits pursuant to Title II, the claimant must also establish they were either permanently disabled, or subject to a condition which became so severe as to disable them, prior to the date upon which their disability insured status expired, i.e., prior to their "date last insured" for benefits. *See*, *e.g.*, *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).[2]

---

[2] Spencer's date last insured for Title II benefits was June 30, 2021. (ECF No. 12-3 at 17).

The same five-step sequential evaluation governs eligibility for benefits under both Title II and Title XVII. *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). First, the claimant must establish they were not gainfully employed at the time of their application. *See* 20 C.F.R. § 404.1520(a)(4)(i). Next, the claimant must be suffering from a "medically severe" impairment or "combination of impairments." *Id.* § 404.1520(a)(4)(ii). The third step is to determine whether any of the claimant's impairments meets or equals one of the "listed" impairments included in Appendix 1 to this section of the Code of Federal Regulations. *See id.* § 404.1520(a)(4)(iii). If any of the claimant's impairments meets or equals one of the impairments listed in Appendix 1, the claimant is conclusively "disabled." *See id.*

The fourth step of the process requires the Commissioner to determine whether the claimant, despite their impairments, can perform work similar to work they have performed in the past. This requires the Commissioner to make an assessment of the plaintiff's "residual functional capacity" to do work-related tasks on a sustained basis. A claimant whose "residual functional capacity" allows them to perform their "past relevant work," despite their impairments, is denied benefits. *Id.* § 404.1520(a)(4)(iv).

The claimant bears the burden of proof throughout the first four steps of the evaluation. *See Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012); *Valentine v. Social Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009); *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995). If the claimant establishes they cannot perform their past relevant work because of their impairments, the Commissioner proceeds to step five. At step five of the evaluation the burden shifts to the Commissioner to demonstrate the claimant can perform other substantial gainful work that exists in the national economy, given their residual functional capacity. *See* 20 C.F.R. § 404.1520(a)(4)(v); *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014). In making this determination the Commissioner must consider vocational factors such as the claimant's age, education, and past work experience. *Id.* § 404.1520(g). If the claimant can adjust to other work, the Commissioner

must find that the claimant is not disabled. *Id.* § 404.1520(g)(1). If the claimant is not capable of adjusting to other work, the analysis concludes with a finding that the claimant is disabled and entitled to benefits.

### III.    Standard of Review

The Court's jurisdiction extends to review of the final decision of the Commissioner denying Spencer's application for Social Security disability benefits. *See* 42 U.S.C. § 405(g). Judicial review of a decision of the Commissioner is based upon the pleadings and the administrative record of the contested decision. *See id.* The scope of the Court's review is limited to determining whether the ALJ applied the correct legal standards to Spencer's claims for benefits and whether the record as a whole contains substantial evidence to support the ALJ's findings of fact. *See id.* § 423; *Allen v. Kijakazi*, 35 F.4th 752, 756 (9th Cir. 2022); *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020). Satisfying the substantial evidence standard requires more than a scintilla but less than a preponderance of record evidence. *E.g.*, *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence has been defined as the amount of relevant evidence a reasonable mind would accept as adequate to support a conclusion. *Id.* at 1154.[3] *See also Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022); *Garrison*, 759 F.3d at 1009. The Court should uphold the ALJ's decision "unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

The Court must consider the record evidence in its entirety, weighing both the evidence that supports and detracts from the ALJ's conclusion. *Luther v. Berryhill*, 891 F.3d 872, 875 (9th Cir. 2018). A reviewing court may not affirm the ALJ's denial of benefits by isolating a specific quantum of supporting evidence. *Trevizo v. Berryhill*, 871

---

[3] The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. []. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. []. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

F.3d 664, 675 (9th Cir. 2017); *Revels v. Berryhill*, 784 F.3d 648, 654 (9th Cir. 2017). Furthermore, where "the evidence can reasonably support either affirming or reversing a decision," the Court may not substitute its judgment for that of the ALJ. *Garrison*, 759 F.3d at 1010. *See also Shaibi v. Berryhill*, 883 F.3d 1102, 1108 (9th Cir. 2017); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). And if the ALJ's legal error was harmless, i.e., if there is substantial evidence in the record to support the ALJ's conclusion on the challenged issue absent the legal error, the case need not be remanded for further proceedings. *See*, *e.g.*, *Ford*, 950 F.3d at 1154; *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015).[4]

## IV.   Record on Appeal

Spencer was born in September of 1989, and was 31 years of age when she most recently applied for disability benefits in October of 2020, asserting she became disabled on October 21, 2020. (ECF No. 12-7 at 19).[5] Spencer graduated from high school. (ECF No. 12-7 at 11). In her application for benefits Spencer stated that from March of 2008 through April of 2018 she worked as a customer representative in the retail sector, and that she ceased working on April 1, 2018. (ECF No. 12-7 at 10-11). She reported her job required her to walk for six hours per day and sit for one hour per day, and that each day she frequently lifted up to 55 pounds in sales inventory. (ECF No. 12-7 at 12). Spencer reported her medications as tizanidine for fibromyalgia and sertraline (a selective serotonin reuptake inhibitor) for anxiety disorder. (*Id.*).

Spencer's earnings report shows minimal earnings in 2008, 2015 ($1189.35), and 2018 ($2786.49); earnings of less than $22,000 in 2009, 2010, 2011, 2012 ($17942.64), 2013 ($12160.10), 2016 ($15308.65), and 2017 ($18106.02); and no earnings in 2014.

---

[4] The Ninth Circuit Court of Appeals recently stated, albeit in an unpublished decision, that the claimant bears the burden of showing a legal error in a decision denying disability benefits was harmful. *Lashley v. Kijakazi*, 2023 WL 4105215, at *1 (9th Cir. June 21, 2023). *See also Gonzales v. Commissioner of Soc. Sec. Admin.*, 356 F. Supp. 864, 876 (D. Ariz. 2018).

[5] Spencer was previously denied disability insurance benefits in a matter alleging she became disabled due to fibromyalgia on April 19, 2018; this application for benefits was denied on November 28, 2018. (ECF No. 12-4 at 4-15; ECF No. 12-5 at 2-3). Spencer also filed a claim for disability benefits in 2014, and benefits were denied in June of 2016. (ECF No. 12-4 at 5).

(ECF No. 12-6 at 17-18, 22, 25-26). From 2009 through 2013 Spencer worked for the Cibola General Hospital Corporation, and from 2015 through 2018 she worked for Wal-Mart. (ECF No. 12-6 at 19-20). Spencer also worked for Smiths Food and Drug Centers in 2018. (ECF No. 12-6 at 20). At the ALJ hearing Spencer stated she also briefly worked for Verizon "in 2018 for about a month." (ECF No. 12-3 at 61).

Although Spencer ceased working on April 1, 2018, in her most recent application for benefits Spencer alleged she became unable to work on or about October 21, 2020 (ECF No. 12-7 at 19, 21), due to anxiety disorder, a bad hip, a bulging disc in her lower back, depression disorder, fibromyalgia, irritable bowel syndrome, small nerve "nephropathy," and tendonitis in her right shoulder. (ECF No. 12-7 at 10).[6]

A cervical spine MRI conducted March 9, 2020, showed normal discs and facets at the C2-3 and the C3-4 level, with no herniation or stenosis. (ECF No. 13 at 26). At the C4-5 level facets appeared normal, there was no herniation or stenosis, and disc height was maintained, albeit with "slight" disc bulging. (*Id.*). There was "slight" narrowing of the disc space at the C5-6 level, the facets appeared normal, and there was no herniation or stenosis. (*Id.*). There was "slight disc bulging" at the C6-7 level, with disc height maintained and normal facets, and no herniation or stenosis. (*Id.*). At the C7-T1 level there was mild facet hypertrophy, with normal disc and no herniation or stenosis. The diagnostic impression "[n]o cervical spine herniation or stenosis seen." (*Id.*).

From May of 2020 through November 18, 2020, Spencer was seen at the Pain Institute of Southern Arizona. At her initial appointment on May 13, 2020, Dr. Seelbach noted:

> Patient has fibromyalgia with widespread diffuse complaints of pain. She has tried and failed all reasonable conservative measures including injection interventions, physical therapy, medication management, and lifestyle modification. Other potential etiologies for her symptoms, such as rheumatoid arthritis, hypothyroidism, vitamin deficiency, have been ruled out. We have started her on low-dose naltrexone with unclear benefit. For

---

[6] Nephropathy is a form of kidney disease common to those with diabetes. Spencer apparently meant to specify small nerve neuropathy.

> reasons that are not clear to me, I did not receive her request for refill on this medication and she has been out for several months. Today, we will restart her naltrexone at 4.5 mg daily. I will supply her with ×2 refills and have her follow-up with our NP team for refill in 3 months. Obviously, we cannot prescribe opioids as these are not indicated for fibromyalgia related pain. I did offer her a trial of trigger point injections that there is risk for worsening fibromyalgia pain with this intervention so, understandably, she declines at this time.

(ECF No. 12-9 at 46).

In August of 2020 Spencer reported to NP Kopecky at Pain Institute of Southern Arizona, reporting her medication, tizanidine, was "not causing any relief towards her pain." (ECF No. 12-9 at 29).

Spencer was seen by NP Niemi-Olson at the Neurological Associates of Tucson Center for Neurosciences on August 12, 2020. (ECF No. 13 at 11).  The treatment notes state:

> … Patient is concerned because her numbness and tingling in generalized pain worsens. Her biggest complaint is that she has fatigue and trouble sleeping. She has pain in her back in her neck and randomly throughout her body in various places. … Occasionally when she stands up too quickly she gets lightheaded and dizzy and occasionally she suffers from palpitations …

(*Id.*). A review of symptoms was negative for decreased hearing, shortness of breath, heart palpitations, memory loss, and depression. (ECF No. 13 at 12). Upon examination mental status was normal, hearing was normal, shoulder shrug was normal, gait was normal, and there was normal motor strength in all extremities. (ECF No. 13 at 12-13). NP Olson noted possible small fiber neuropathy. (ECF No. 13 at 11).

Spencer was seen by Dr. Valdivia at the Center for Neurosciences on September 2, 2020. (ECF No. 13 at 9). The history of present illness was: "10 year history of chronic pain with parenthesis both upper extremities and lower extremities. 16 places. Numbness and tingling sensation. Chronic pain. Diagnosed with fibromyalgia. Also complains of lightheadedness with postural changes." (*Id.*). Upon examination Spencer's mental status was normal, and she displayed normal shoulder strength and flexion. There was "[n]o

weakness on [d]evelop muscle testing proximally and distally both upper and lower extremities. No atrophy." (ECF No. 13 at 9-10). Reflexes were "1+ upper extremities, 2+ lower extremities and symmetric," gait was normal, and Spencer displayed "normal hopping on either foot, runs well, tandem walks well." (ECF No. 13 at 10).  The notes state: "Suspect patient has small her neuropathy associated with her fibromyalgia syndrome. Needs skin biopsy to determine the type of small fiber neuropathy she has. She also has some autonomic features. She probably needs autonomic evaluation as well …" (ECF No. 13 at 9).

Spencer was seen by NP Olson on October 20, 2020. NP Olson noted a biopsy and lab tests showed "abnormal intra-epidermal nerve fiber density at all sites. This typically means a neuropathy affecting small nerve fibers." (ECF No. 13-2 at 20). NP Olson reported: "Went over [] her signs and symptoms primarily nausea, lightheadedness, dizziness palpitations traveling numbness and tingling, intense fatigue." (*Id.*).

On November 11, 2020, Spencer saw NP Kopecky via telemedicine, and reported diffuse body pain. (ECF No. 12-9 at 8). "Active problems" were listed as chronic pain syndrome, fibromyalgia, lumbar disc degeneration, lumbar radiculopathy, neuropathy, and left-sided Piriformis syndrome.[7] (*Id.*). Spencer described her pain as constant burning, cramping, throbbing, electric, sharp, shooting, and stabbing. (*Id.*). She reported her pain was at best 8/10, and that the pain was exacerbated by sitting, pushing, activity, damp weather, cold, tension, lifting, standing, lying down, and walking. (*Id.*). Spencer reported tizanidine provided mild relief, i.e., "10% relief." (*Id.*). She reported no relief from injection therapy in 2019, and stated she had participated in physical therapy three times per week for four to six weeks in 2019. (*Id.*). NP Kopecky noted a 2020 EMG revealed normal results with regard to the right upper and lower extremities, a lumbar spine MRI in 2019 revealed mild spondyloarthropathy of the lumbar spine "with most significant findings on the right L5-S1." (ECF No. 12-9 at 9-10). NP Kopecky noted no

---

[7] Piriformis syndrome is a condition that causes pain or numbness in one's butt, hip or upper leg when the piriformis muscle compresses the sciatic nerve.

cardiovascular, pulmonary, neurological or skin symptoms, but back pain and joint stiffness. (ECF No. 12-9 at 11). Spencer's cognitive functioning was normal, with normal attention and communication. (*Id.*). NP Kopecky encouraged Spencer to increase her activity, "as chronic pain seems to be improved with increasing activity levels. The patient was counseled against prolonged bed rest as this can precipitate increased pain and decreased function. (ECF No. 12-9 at 12).

At her last Pain Institute visit, on November 18, 2020, Spencer reported Tylenol with codeine upset her stomach, and she was started on hydrocodone. (ECF No. 12-9 at 6).

Spencer was seen by Dr. Winter at Pima Heart and Vascular on November 18, 2020. (ECF No. 13-2 at 84). The notes state:

> Meagan presents to establish care for a cardiac check up due [to] small fiber neuropathy, referred by [] Olson. She has a h/o migraine, sciatica, chronic pain, neuropathy, small fiber neuropathy (through skin biopsy), depression, and fibromyalgia. She experiences sharp substernal chest pain about 3x/month which lasts for a couple minutes. Chest pain radiates to her back and worsens with some movements/activity. She notes occasional palpitations, and lightheadedness a few x/week which does not progress to near syncope. She denies SOB, DO, orthopnea, PND, and syncope. She drinks plenty of water and is active with ADLs. She lives with her brother, is applying for disability, and performs ADLs independently.

(*Id.*). Dr. Winter noted: "Chest pain is atypical, noncardiac, not anginal, most likely musculoskeletal. BP 130/88, heart rate 91 bpm. Electrocardiogram is normal." (*Id.*). Spencer reported, *inter alia*, no memory loss or depression, but she did report vertigo, dizziness, anxiety, and joint pain. (ECF No. 13-2 at 86). Her gait was normal and she was able to exercise. (*Id.*).

In an Adult Function Report submitted to the Commissioner on November 27, 2020, Spencer stated: "In so much pain I can't function. It prevents me from sleeping so I have to spend as much time as I can to sleep. I [cannot] handle car rides because of the pain. I almost constantly have a migraine. I have a hard time with my balance." (ECF No. 12-7 at 22). With regard to her daily activities she reported: "mostly sleep because of the

pain. my daily tasks are limited as well." (ECF No. 12-7 at 23). She stated she took care of pets, i.e., "clean the litter box, provide shelter and grooming," stating her "older brother cleans the litter box." (*Id.*). She reported that before her illnesses she could "work and function like a normal person." (*Id.*). Spencer stated she had "to wear very little soft clothes because of the pain," and she could not "shower because of my balance so baths only." (*Id.*). She stated she had her "hair cut very short because of pain," but she had no problems shaving. (*Id.*). Spencer relied on "bars to get up and down" when using the toilet. (*Id.*). Spencer averred she ate a limited diet and could prepare microwaved food. (ECF No. 12-7 at 24). Spencer reported she could do laundry and she did dishes "2 days." (*Id.*). Spencer went outside twice a day, and reported she could walk and drive, and she did drive and go out alone. (ECF No. 12-7 at 25). Spencer reported grocery shopping once each week for one to two hours. (*Id.*). Spencer reported she could count change and handle a savings account. (*Id.*). Spencer listed reading, watching television, and sewing as her hobbies, stating she did these things "very often," and "sewing is done by hand because of shaking," i.e., "I shake [too] bad to sew with sewing machine." (ECF No. 12-7 at 26). She reported spending time with others once per day to talk, eat, and shop, in person and via text messaging. (*Id.*). As to her physical abilities, Spencer stated she could only lift eight pounds, and she couldn't squat, bend, or kneel due to her back pain. She also stated: "same goes for walking or sitting [too] long. I can't reach very far. Brain fog." (ECF No. 12-7 at 27). She reported she could walk for half a block before needing to stop and rest for fifteen minutes. (*Id.*). She reported she could pay attention for "pretty long," and could follow written instructions "very well," although she "sometimes" needed spoken instruction repeated. (*Id.*). In response to the question: "How well do you handle stress?" she replied "I don't," and stated handling changes in routine was "no problem." (ECF No. 12-7 at 28). Spencer reported her medications as hydrocodone, which caused dizziness, tizanidine, which caused dizziness, and sertraline, which caused drowsiness. (ECF No. 12-7 at 29).

Spencer was seen by NP Olson on December 2, 2020. The notes state

> She has small fiber neuropathy and is being worked up for postural orthostatic tachycardia syndrome by Dr. Winter her cardiologist. Her lab work came back looking pretty good except for a mildly elevated ACE which can be concerning for sarcoidosis. We did discuss the fact that the elevation is very very minimal and will likely need to be repeated before and if definitive diagnosis can be achieved.

(ECF No. 13-2 at 15). Symptoms were negative for decreased hearing, shortness of breath, depression, trouble sleeping, and daytime sleepiness. (*Id.*). Assessments included small fiber neuropathy, fatigue, paresthesia/numbness, palpitations, and nausea. (ECF No. 13-2 at 17). NP Olson noted: "She has seen cardiology to work up POTS [postural orthostatic tachycardia syndrome]. Recommend evaluation by rheumatology to either closely monitor or possibly treat with MG or steroids if needed." (*Id.*).

Spencer was seen by NP Olson on March 3, 2021. (ECF No. 13-2 at 48). The treatment notes from that visit state:

> … She has a history of small fiber neuropathy. She is failed multiple oral treatments for the symptom control. Currently she is on tizanidine for muscle spasms. She has a chronic migraine condition that occurs almost daily. It is unilateral throbbing pulsating with light sensitivity and nausea and vomiting. While we cannot prescribe any gabapentin, Lyrica or duloxetine to help her chronic pain we might be able to help her chronic migraine. Recommend trying topiramate now that she found that nortriptyline was ineffective. She has 15+ migraines per month lasting 4-24 hours. We will also recommend an ACE lab repeat since she did have some abnormality.

(*Id.*). The assessments that day were chronic migraine and small fiber neuropathy.

Spencer was seen by NP Nieuwenhuys at Pima Heart and Vascular on March 8, 2021. (ECF No. 13-2 at 81). Those treatment notes state:

> Meagan returns for AFT testing, last seen 11/18/2020. She has a [history of] migraine, sciatica, chronic pain, neuropathy, small fiber neuropathy (through skin biopsy), depression, and fibromyalgia.
> Overall she feels about the same since last visit. She experiences daily racing palpitations while at rest and with exertion, as well as daily orthostatic dizziness that does not progress to near syncope, but causes imbalance with a recent fall. She notes infrequent substernal, non-radiating

1

2

> chest discomfort that she experiences typically at night while at rest with
> palpitations. She experiences SOB and DOE while walking long distances,
> and uses a walker around home. … She drinks plenty of water and does
> light yoga. She … performs ADLs independently.

3

4

(*Id.*). NP Nieuwenhuys determined: "We will start fludrocortisone …, provide her with

5

full-length leggings and advised her to increase fluid and salt intake (48 to 68 ounces, 6

6

to 10 g sodium chloride). … The importance of medication compliance was discussed

7

with the patient." (ECF No. 13-2 at 81-82).

8

Spencer was seen by NP Nieuwenhuys on April 5, 2021. The notes state: "Overall

9

she feels about the same since last visit. … She lives with her brother, is applying for

10

disability, and performs ADLs independently." (ECF No. 13-2 at 76). NP Nieuwenhuys

11

noted "autonomic function testing performed on 3/8/2021 demonstrated evidence of

12

postural tachycardia. Findings also are consistent with postganglionic small fiber

13

neuropathy." (ECF No. 13-2 at 78). There were no abnormal or concerning findings on

14

examination. (ECF No. 13-2 at 79).

15

On May 6, 2021, at the behest of the state disability agency, Spencer underwent a

16

psychological examination by a consulting psychologist, Dr. Belton. (ECF No. 13-2

17

at 56).  Dr. Belton noted allegations of anxiety, depression, a hip problem, bulging disc,

18

fibromyalgia, irritable bowel syndrome, small nerve neuropathy, and shoulder tendonitis.

19

(*Id.*). Spencer reported her current medications as fludrocortisone, topiramate, tizanidine,

20

and sertraline. (*Id.*). Dr. Belton performed a Psychological Survey (Clinical Interview)

21

and a Mini Mental Status Examination ("MMSE"). (*Id.*). Dr. Belton noted:

22

23

24

25

26

27

> Ms. Spencer shared "everything has gotten so bad that I can't
> physically work anymore." She described diagnosis of fibromyalgia and
> asserted "I was working at the hospital when I got really sick."[8] She
> reported diagnosis of "a neuro virus" and could not offer additional details.
> Specifically, this evaluator inquired about who offered this diagnosis and
> its prevalence. She replied, "it was my primary doctor and I'm not even
> sure what it is." However, she noted "it lasted for about a month and was
> like a really bad flu." Since this illness, she reported challenges with

28

---

[8] From 2009 through 2013 Spencer worked for the Cibola General Hospital Corporation.

memory skills and insisted "I can't even remember what I did yesterday sometimes."

She disclosed history of employment with Walmart for 2 years and shared "I got fired." This evaluator invited elaboration and she asserted "it's hard to work when you don't feel well." She reported working with Acme in the call center and noted "they fired me too because I couldn't keep up with all the computer stuff." Ms. Spencer has not been employed since 2018.

She asserted "I'm hurting all the time and it hurts so damn bad." Ms. Spencer reiterated "I physically can't have a job or work anymore." She reported "fibro fog" and when asked to elaborate, she explained "it's my memory." She described difficulty with short-term memory and indicated challenges with "remembering the things I do yesterday."

Ms. Spencer described "feeling depressed and anxious for years." She noted an onset of "since all of this started" referencing diagnosis of medical conditions. She did not report and/or endorse thoughts, plans, and/or intent for self-harm. Also, she has no history of psychiatric hospitalization.[9] She resides with her brother and shared "it's one of my parents two homes and they let us live there."

(ECF No. 13-2 at 57). Dr. Belton noted "Ms. Spencer has not been employed since 2018 and was terminated from her last two positions." (ECF No. 13-2 at 58).

Dr. Belton further noted:

Ms. Spencer described her mood as "depressed and anxious" with an onset of "after all this started" referring to her medical conditions. She denied suicidal or homicidal ideation and reported no intent or plan for self-harm. She has no history of psychiatric hospitalization. Hallucinations of any modality were denied. She has not participated in therapy services and asserted "honestly, I think they're all quacks."

Ms. Spencer reported ability to engage in daily life activities involving personal hygiene, household chores/responsibilities, preparing meals, and fiscal management skills.

(ECF No. 13-2 at 57).

Dr. Belton noted Spencer was well-groomed and appropriately dressed, and that she walked independently and with no gait abnormalities. Her speech was fluent and her thought process was coherent and intact, although she presented with "flat affect." (ECF

---

[9] There are no psychological or psychiatric treatment notes in the record on appeal, or any indication of a formal diagnosis of depression or anxiety. Dr. Belton does not specify what "records" were "reviewed."

No. 13-2 at 57-58). Spencer scored a 26 out of a possible 28 on the MMSE, an average score for her age and education. (ECF No. 13-2 at 59). Dr. Belton opined:

> Ms. Spencer's presentation appeared influenced and exacerbated by medical conditions. It is plausible that with stabilization of pain symptoms and accompanying physical ailments, along with participation in therapy services to open a dialogue around coping strategies, she might not report or endorse affective dysregulation over the course of the next 12 months.

(ECF No. 13-2 at 60). The doctor noted: "given self-report, records reviewed, and clinical observations, a diagnostic impression of depressive disorder due to medical conditions is offered to help capture Ms. Spencer's overall presentation. As mentioned above, it is possible that with stabilization of her medical conditions, she might not report and/or endorse affective dysregulation over the course of the next 12 months." (*Id.*). Dr. Belton deferred an opinion as to whether any limitation associated with a psychiatric diagnosis would last for a period of 12 months. (ECF No. 13-2 at 61).

Spencer was seen by NP Nieuwenhuys at the Santa Catalina Health Center location of Marana Health Center on May 12, 2021. (ECF No. 13-3 at 17). The notes state:

> Ms. Spencer is a 31 year old female who presents here today with complaint of Requesting labs: B12
> --still having chronic pain from small fiber neuropathy
> --went to a PM [pain management] doctor - dr. steelbeck and noticed no improvement – she's been referred to a new PM doctor and is waiting to see him.
> due to her hx of Potss, [chronic] pain and small fiber [neuropathy]- her mother would like to have her B12 checked. due to her [chronic] pain- she [declines] [wanting] [therapy] or any increase of her [medications]

(*Id.*). Spencer reported her medications as tizanidine, sertraline, and a contraceptive. (*Id.*). With regard to the prior diagnoses of small fiber neuropathy, chronic pain, and anxiety, the notes state: "I did let patient know she most [likely] will be in pain for a while psychotherapy would be helpful for this she declined the[rapy]." (ECF No. 13-3 at 19).

Spencer participated in a physical and neurological consultation with Dr. Palmer on May 18, 2021, at the behest of the state agency. (ECF No. 13-2 at 63). Dr. Palmer's notes state:

> The claimant reports a history of fibromyalgia with chronic pain starting 10 years ago. Currently, she has widespread myofascial pains "everywhere." Currently, the pains are 10/10 intensity, on average the pains are 10/10 intensity. She has chronic fatigue. Because of chronic pain, she prefers sleeping for prolonged periods daily/lately.
>
> The claimant reports she has undergone both electrodiagnostic studies and a nerve biopsy. She has been diagnosed with small fiber neuropathy at the Center for Neurosciences. The claimant mentions she gets tingling, numbness and stabbing pains from neuropathy, most predominantly affecting her lower legs and feet and to a lesser degree of severity, her thighs and hands. Occasionally, she gets tingling and numbness in her forearms and upper arms. The symptoms of neuropathy have been present for the last few years. She mentions the symptoms of neuropathy are worsened by prolonged periods of sitting or prolonged periods of standing. They are also worse at nighttime. The claimant mentions because of the severity of neuropathic pain, tingling and numbness affecting her extremities, when shopping for example at Hobby Lobby, her mother pushes her in a manual wheelchair.
>
> The claimant reports in the [distant] past she dislocated her right shoulder. Currently, she has pain affecting her right shoulder with movements of her right hand over head and movements of her right hand behind her back.
>
> The claimant reports she has bulging disk in her lumbar spine. She has had epidural steroid injections. She gets pain affecting her back with active movements of her back.
>
> The claimant reports a history of chronic recurrent migraine headaches. She gets a severe 10/10 intensity headache causing her to be confined to a quiet dark room and with the headaches, she will have nausea, vomiting and photophobia. She started the medication Topamax in March of this year, which has been of benefit reducing the frequency of migraine headaches. **Her most recent headache was 4 days ago, prior to that 3 months ago**. She does not experience an aura with headaches.

(ECF No. 13-2 at 63-64) (emphasis added). Dr. Penner reported the date last worked as "March 18th," and the occupation type was "call service." (ECF No. 13-2 at 64). Dr. Penner reported Spencer dressed, bathed, toileted, prepared meals, and performed household chores "independently," further noting Spencer used a shower chair and rails

with regard to bathing but did not need any devices to use the toilet. (ECF No. 13-2 at 64-65). Spencer told Dr. Penner she used an electric scooter or manual wheelchair for "distance travel or shopping," and that she was "[l]imited by pain, tingling and numbness from small fiber neuropathy." (ECF No. 13-2 at 65). Dr. Penner noted normal gait and posture, and that Spencer did not have an ambulatory device. (*Id.*). Spencer was comfortable when seated, with no guarded movements of her neck, back, or upper or lower extremities. (*Id.*). He noted she moved slowly, to a minor degree, regarding positional changes from sitting to standing. (ECF No. 13-2 at 66). The doctor noted normal plantar and dorsiflexes on both feet when heel and toe walking, and minor unsteadiness in tandem walking. (*Id.*). Upon examination there was normal spinal curvature, normal reflexes, minor asymmetry of the shoulders and no muscular atrophy of either shoulder or any of the upper or lower extremities. (*Id.*). There were a total of 17/18 myofascial tender points, but no subjective or objective tenderness with palpation of the right lower anterior cervical region. (*Id.*). There was endpoint pain in the right shoulder with regard to range of motion, and mild endpoint discomfort with regard to some movements in the neck. (*Id.*). There was some endpoint pain with regard to some movement in the back and hips (with internal rotation, abduction and adductions), but easy hip movement in all planes. (ECF No. 13-2 at 67). Hand strength and upper and lower extremity strength was normal. (*Id.*).

Dr. Penner noted the diagnoses of fibromyalgia, small fiber neuropathy, bulging disk lumbar spine, right should strain, and migraine headaches. (ECF No. 13-2 at 69). Dr. Penner opined Spencer would only occasionally be able to lift 20 pounds and could frequently lift 10 pounds. (*Id.*). He further opined Spencer could walk six to eight hours in an 8-hour day, that she could sit for six to eight hours in an 8-hour day, and that an assistive device was necessary only for pain and was not medically necessary. (ECF No. 13-2 at 69-70).

Spencer was seen by NP Nieuwenhuys at Pima Heart and Vascular on June 2, 2021. (ECF No. 13-2 at 74). The notes state:

> Meagan returns for ongoing care of neuropathic POTS, last seen 04/05/2021. … At last visit, propranolol SR 60 mg QD was initiated, but she felt very nauseous taking it and discontinued shortly after. Overall, she feels about the same. She experiences daily racing palpitations while at rest and with exertion, as well as daily orthostatic dizziness that does not progress to near syncope. She notes DOE with walking. **She denies chest pain**, SOB, orthopnea, PND, or syncope. She drinks plenty of water and does light yoga. She … performs ADLs independently.

(*Id.*) (emphasis added). Spencer's gait was normal and she reported being able to exercise. (ECF No. 13-2 at 76). The notes state:

> Follow-up for neuropathic pots. See HPI for additional medical issues patient also has small fiber neuropathy. Patient is not doing well on propranolol [a beta blocker used to treat high blood pressure, irregular heartbeats, and shaking or tremors], this was discontinued She would be a good candidate for increasing Corlanor [a heart medication] to 7.5 mg. We will see her again in 9 months.

(ECF No. 13-2 at 74).

Spencer's claim for disability benefits was denied initially on June 4, 2021. (ECF No. 12-4 at 28, 40).

Spencer was seen by NP Olson on June 9, 2021. (ECF No. 13-3 at 35). Spencer reported "**she has not [had a] migraine since starting the topiramate**. She has a few smaller headaches a month but she was experiencing prior to the medication. she feels like she does very well with [t]his medications will be encouraged that she continue." (*Id.*) (emphasis added). Upon examination Spencer was alert, with normal memory and mood. (ECF No. 13-3 at 36). There was normal motor strength and no atrophy regarding both upper and lower extremities, reflexes were normal, and gait was normal. (*Id.*). Assessments were small fiber neuropathy and chronic migraine. (*Id.*).

Spencer was seen at Marana Health Center by NP Nieuwenhuys on June 16, 2021, complaining of back pain. (ECF No. 13-3 at 11). The notes state: "slipped on a chair x 7 days ago, was wearing bbal short which were slicker than normal – slipped and hit her sacrum. Has minimal bruising. gait is normal. Denies radicul[o]pathy." (*Id.*). The notes

also state "has small fiber neuropathy-goes to PM, was supposed to start nortripyline, never did. will send today. sees neuro for migraines-on topamax for migraines." (*Id.*).

On June 18, 2021, NP Olson signed a "To whom it may concern" letter, stating: "This is a note to confirm that [Spencer] is being seen in my office for her follow up doctor's appointments. I confirm that Meagan does have small fiber neuropathy and chronic migraines. We are currently treating her with medications to help with diagnosis." (ECF No. 13-3 at 22).

The record indicates that, after her initial examination, Spencer was seen by nurse practitioners during her visits at Pima Heart and Vascular. Dr. Winter signed a "To Whom It May Concern" letter on June 18, 2021. (ECF No. 13-2 at 88). This letter states:

> Meagan Spencer has been a patient at Pima Heart and Vascular since 2017 and a patient of Dr. Jerrold Winter's since November of 2020. She was evaluated and diagnosed with POTS (postural orthostatic tachycardia syndrome) by autonomic function testing. Patient previously was diagnosed with small fiber neuropathy, fibromyalgia, anxiety, depression, sciatica and IBS.
> Patient experiences daily debilitating symptoms that prevent her from working at this time including, lightheadedness that may or may not progress to near syncope, daily racing palpitations, fatigue, DOE with walking, migraines, and chest pain.
> Patient is also unable to sit, stand, or walk for long periods of time. She uses a walker for ambulation at home. If anyone has any questions or concerns please contact me directly []. Thank you.

(*Id.*). An additional letter signed by Dr. Winter on June 18, 2021, states: "Megan Spencer is a patient of mine at Pima Heart Associates. She was last seen on 6/2/2021. She is followed for neuropathic postural orthostatic tachycardia syndrome and multiple noncardiac diagnoses. She continues to have symptoms of palpitations and nausea. Activities of daily living are limited (please refer to last office note of 6/2/2021)." (ECF No. 13-2 at 89).

On June 29, 2021, Dr. Winter completed a medical source statement regarding Spencer's physical ability to do work-related tasks. (ECF No. 13-3 at 23). Dr. Winter opined Spencer was limited to carrying five pounds or less, and less than one-third of the

time; that she could stand or walk less than two hours in an 8-hour workday ("Pt must take frequent breaks in between standing and sitting"); Spencer could sit less than 6 hours in an 8-hour workday; Spencer's "frequent dizziness making it incredibly difficult to effectively perform the above actions," i.e., she could never climb, balance, kneel, crouch, crawl, or stoop; her ability to reach, handle, finger, and feel was limited ("it is difficult and painful for patient to perform above activities due to POTS and neuropathy"); Spencer had limited ability with regard to seeing and speaking ("POTS also causes frequent brain fog and possible visual changes"); and Spencer required a controlled environment with regard to environmental limitations such as temperature, noise, dust, vibrations, humidity, and fumes. (ECF No. 13-3 at 23-26).

At a gynecological examination on August 17, 2021, Spencer reported no fatigue, no vision changes, no dyspnea or shortness of breath, no chest pain, no palpitations, no nausea, no muscle aches or weakness, no arthralgias or joint pain, and no back pain, and displayed a full range of motion in her neck. (ECF No. 13-3 at 29). She reported no headaches or dizziness, and no depression, and displayed normal mood and affect. (*Id.*).

Spencer was seen by NP Nieuwenhuys at Pima Heart and Vascular on September 29, 2021. (ECF No. 13-3 at 98). She reported migraine, sciatica, chronic pain, neuropathy, depression, and fibromyalgia. "Overall, she feels about the same. She experiences daily racing palpitations while at rest and with exertion, as well as frequent orthostatic dizziness that does not progress to near syncope. She notes DOE with walking. She denies chest pain … She drinks plenty of water and does light yoga … performs ADLs independently." (*Id.*). The notes state "… autonomic function testing was performed on 3/8/2021 … Findings are consistent with neuropathic pots." (*Id.*).

Spencer was seen by NP Olson on October 12, 2021. (ECF No. 13-3 at 32). She reported her "headaches are manageable and infrequent at this time. She does have a lot of chronic pain and fibromyalgia." (*Id.*). Spencer also reported "symptoms of tinnitus and ear sensitivity." (*Id.*). NP Olson noted:

> Her migraines are under good control at this time she takes a very small dose of topiramate which helps a lot. She says that her headaches are manageable and infrequent at this time. She does have a lot of chronic pain and fibromyalgia. She notes that she has some new concerning symptoms of tinnitus and [ear] sensitivity. She says that when she is attending zoom church or in a restaurant that the sounds and voices blending together seem to aggravate her. she feels a sharp pain in her left ear and she has some ringing associated with this. She denies any hearing loss …

(*Id.*). Spencer reported no memory loss or depression, no nausea, and no trouble sleeping. (ECF No. 13-3 at 33). She was referred to an audiologist. (*Id.*).

An MRI of the cervical spine on December 6, 2021, revealed "[c]ervical spinal cord appears normal," "[m]ild cervical degenerative changes, without spinal or foraminal stenosis." (ECF No. 13-3 at 30).

Spencer was seen by NP Berg at Northwest Allied Physicians on January 3, 2022, complaining of congestion and shortness of breath. (ECF No. 13-3 at 55, 57). The treatment notes state:

> Has found her allergies driving her insane. … Has felt more short of breath recently. Did see her cardiologist but was told it had nothing to d[o] with her heart and was likely a consequence of COVID19. … Has felt more fatigued, more than usual.
> Has been walking a lot more, down to her mailbox daily.
> No previous chest imaging or evaluation of lung function has been pursued.
> … Depression, moderate recurrent.
> Also due for depression medication refill for which she reports stability of symptoms with current meds.

(ECF No. 13-3 at 57).

Spencer's claim for disability benefits was denied upon reconsideration on February 3, 2022. (ECF No. 12-4 at 52, 64).

Spencer was seen by NP Olson at the Center for Neurosciences on February 14, 2022. (ECF No. 13-3 at 77). NP Olson noted Spencer's migraines were under control with a small dose of topamax, and that "her small fiber neuropathy has not changed at all. She does have some new neck pain but no radicular symptomatology …" (*Id.*). NP Olson noted "**no falls in the last 12 months**." (ECF No. 13-3 at 78) (emphasis added).

NP Haskell at the Center for Neurosciences saw Spencer on March 1, 2022. (ECF No. 13-3 at 73). Spencer complained of low back and bilateral leg pain, which was worse on the right side. (*Id.*). Spencer reported she had "tried pain management and physical therapy. … [S]pencer is concerned surgery may be required. Additional complaints are for lumbago with bilateral leg pain. Her last MRI was done in 2020, she states the leg pain has been progressive, aggravated with activity/movement. She is currently applying for disability." (*Id.*). NP Haskell also noted: "A MRI was done at Oro Valley Hospital [on December 6, 2022] that demonstrated no acute or active cervical spine abnormalities. … We discussed physical therapy, however Meagan states this has not been helpful in the past. She was pleased she does not need surgical intervention." (ECF No. 13-3 at 74). A lumbar MRI was ordered and performed on April 8, 2022, and the results were unremarkable other than a small protrusion at L5-S1 with possible nerve impingement and mild lower lumbar degenerative changes. (*Id.*).

Spencer was seen by PA Berg at Pima Heart and Vascular (the practice now belonging to Dr. Molls), on March 30, 2022. Treatment notes state: "She has been doing well. She was recently diagnosed with Covid. She has recovered from that. Her pulse related symptoms are mostly under control. She did not seem to benefit from Cor[la]nor." (ECF No. 13-3 at 95). The notes further state: "Patient has a history of pots syndrome. **She is currently doing very well without any symptoms. She has not had any lightheadedness dizziness, no syncopal events or falls**. We will continue her beta-blocker without changes. We will see her back in 6 months …" (*Id.*) (emphasis added).

Spencer was seen by PA Berg at Northwest Allied Physicians on June 7, 2022, for "follow-up of depression and functional ability paperwork completion." (ECF No. 13-3 at 49, 51). Spencer reported :

> …Has always had issues with sleeping in general. Does find her pain the reason she is waking up in the middle of the night. … Tells me she has been off her nortriptyline for 6 months due to inability to refill. ….
>
> Currently cannot sit, stand for prolonged periods. Recently went on vacation and these longer days wiped her out. Has found symptoms more pronounced with increased exercise/energy expenditure …

(ECF No. 13-3 at 51). A review of symptoms was negative for coughing, palpitations, chest pain, shortness of breath, joint pain, muscle aches, headache, dizziness, paresthesia, numbness, confusion, and anxiety. (ECF No. 13-3 at 51-52). With regard to depression, PA Berg's notation was: "Stable on medications. Sleep has been poor due to lapse in refill of nortryptiline [a tricyclic antidepression medication]." (ECF No. 13-3 at 52).

PA Berg completed a medical source statement of Spencer's physical ability to do work-related activities on June 7, 2022. PA Berg opined Spencer could only occasionally lift 10 pounds and never lift more than 10 pounds. (ECF No. 13-3 at 86). Spencer could walk less than two hours in an 8-hour workday, based on her report that she "cannot always complete short shopping trips." (*Id.*). PA Berg opined Spencer "must periodically alternate sitting and standing to relieve pain or discomfort" ("if hard surface"), and she was limited in her ability to push and pull ("unable to raise right arm above should height"). (ECF No. 13-3 at 87). PA Berg opined all postural functions could never be performed, due to "small fiber polyneuropathy, muscle nerve channel impairment that makes isometric movements very difficult." (*Id.*). PA Berg opined Spencer was limited with regard to reaching and feeling, but unlimited as to handling and fingering. (ECF No. 13-3 at 88). PA Berg also opined Spencer had speaking limitations ("slurring cognitive processing, difficulty processing intended speech, sometimes hearing issues"). (*Id.*). Spencer had various environmental limitations, i.e., those related to temperature, noise, humidity, hazards, fumes ("unable to safely get above hip level, cold and heat dysregulated [illegible] and vascular tone. Noise causes headache."). (ECF No. 13-3 at 89).

Spencer was seen as at the pulmonary clinic of Northwest Allied Physicians on June 23, 2022. (ECF No. 13-3 at 44, 46). The noted "problems" were anxiety, with an onset of November 3, 2021, and fibromyalgia and claustrophobia, with the same onset date. (ECF No. 13-3 at 45). The provider noted exertional dyspnea (shortness of breath) "for the last few years" and a recurrent cough. (ECF No. 13-3 at 46). A chest x-ray on

January 14, 2022, did "not show any acute abnormality. The lungs … appear[] to be hyperinflated." (*Id.*).

On August 4, 2022, the ALJ conducted a hearing regarding Spencer's claim for disability benefits. (ECF No. 12-3 at 53-69). Spencer was represented by a non-attorney, Mr. Mace, at the hearing. Counsel advised the ALJ:

> …Ms. Spencer is unable to perform full-time, competitive work at even the sedentary exertional level due to multiple health issues that limit function and mobility. First, small fiber neuropathy causes numbness and tingling particularly in the legs and limits standing, walking, and sitting. And the citation for that, there are several but primarily 1F, page 1. Ms. Spencer requires frequent position changes for relief and those citations are also 1F, page 1, 2F page 7, and 11F page 1. In addition, a bulging disc impinges on the S1 nerve and that's documented by an MRI at 1F, page 13, and lumbar radiculopathy at 2F, 7, also restricts prolonged sitting. Finally, chronic intractable migraines, and these are cited at 7F, 4, and 11F, 1, and actually throughout the record. In addition to shortness of breath upon exertion, 11F, pages 5 and 6, further limits functioning. Finally, two treating sources, Dr. Jerrold Winter, at 12F, and physician assistant Amanda Berg (PHONETIC) at 20F completed medical source statements. Both agree that Ms. Spencer is restricted to less than sedentary work and would be unable to stand and/or walk for more than two hours of an eight-hour workday.

(ECF No. 12-3 at 50-51).

The ALJ commented: "Notably absent in your discussion of the severe impairments is mention of fibromyalgia. I want to make sure that that was not an accidental omission, but one based on your clear review of the record," and counsel responded: "I could be incorrect, but I see small fiber neuropathy and fibromyalgia as being the same." (ECF No. 12-3 at 51).

In response to Mr. Mace's question, Spencer averred the most severe problem preventing her from working was "small nerve neuropathy. It's the tingling and the pain in the legs … and the hand." (ECF No. 12-3 at 52). She described the symptoms as "a pins and needle feeling from the back of my lower back all the way to the tips of my toes, so severe that I have to stop what I'm doing and massage my own legs to get it to stop." *Id.* She stated this "comes and goes but it happens quite often. More often than I'd like,"

and in response to a question to be more specific she stated this occurred "[a]bout four to five times a day," and persisted for "[a]bout an hour and a half to an hour" per occurrence. (ECF No. 12-3 at 52-53). She stated this affected her ability to stay seated, i.e., that when this happened she had "to get up and move or move my legs," further clarifying that she could only sit for at most 20 minutes before needing to get up and walk around. (ECF No. 12-3 at 53). In addition to the tingling she described the pain events as "sharp pain in my lower back and it'll start the tingling in my legs. So, I have to get up and slowly move my back until it pinches whatever it's pinching." (ECF No. 12-3 at 54). Spencer testified that she needed to walk around for "[a]bout five minutes" before she could resume sitting. (*Id.*). She also stated she experienced numbness and tingling in her hands and fingertips once or twice a day, which lasted about 30 minutes to an hour, and she needed to massage her hands for about five minutes to relieve the sensation. (*Id.*). With regard to her statement that one of her hobbies was sewing, Spencer averred that when her hands "start going numb, I have to put down my sewing and just not do it until it stops. So, it's a constant working on it for a few minutes, putting it down till it stops, working on it. Just a constant stop and go." (*Id.*). Spencer testified that she sewed non-continuously for about an hour per day, needing to stop after ten minutes. (ECF No. 12-3 at 54-55).

Spencer further averred she experienced dizzy spells about once per week, and the spells lasted a few minutes. (ECF No. 12-3 at 55). She stated the dizziness was "from the POTS and it's from my blood pressure dropping. So, if I stand up even slowly my blood pressure will just drop and – **just complete blackout**." (*Id.*) (emphasis added). Spencer also testified that she experienced two to three migraines per month, or "once or twice a month," and that each migraine lasted "Almost all day," requiring her to go into a dark quiet room, averring: "Nothing else helps." (*Id.*).

After this testimony Spencer's representative noted:

And Social Security sent you to a neurologist for an exam. He wrote that you told him you had a migraine four days previous to the visit and then the previous one was three months. So, what he is saying is that they're not as

- 24 -

frequent as what you're telling us today. So, did he get that wrong or did you tell him that you -

A I'm taking Topamax right now for migraines and that cut them down quite a bit. But stress --

Q But are you … still getting them one to two times a month?

A Yeah, mostly due to stress. It's been kind of stressful these couple months.

(ECF No. 12-3 at 56).

Q [by Mr. Mace] I also noticed that this same examiner said … an assistive device was not medically necessary and that you would only need it for pain not for balance. Is that what you told him?

A No.

Q This is Dr. Richard Palmer at 6F, 8.

ALJ: Who prescribed your walker, Ms. Spencer?

CLMT: No doctor prescribed it. When I started almost falling, my cardiologist, Dr. Winters, suggested it to me on the way out of the doctor's office.

(ECF No. 12-3 at 56-57).

The following colloquy then occurred:

ALJ: He references it [a cane] in his opinions and his letters but not in his treatment records. And I just want to make sure that I didn't miss something where he says yes, she should, or I recommended, or she showed up with a walker and I think that's good. Anything like that in the actual treatment records.

[MR. MACE]: No, I believe you're correct.

ALJ: Okay.

[MR. MACE]: I think he references it in an opinion, yes.

ALJ: And in the opinion, does it say he himself endorses it? Just that she uses it, correct?

[MR. MACE]: Yes.

ALJ: All right. Please continue.

(ECF No. 12-3 at 57).

Spencer further testified she experienced shortness of breath, stating: "I found out that it's actually from asthma." (ECF No. 12-3 at 58). She averred that walking or "some activity" "aggravates it very badly." (*Id.*). She also testified that she experienced falls, i.e., she lost her balance and fell, "[a]bout once a month if I'm not careful." (ECF No. 12-

- 25 -

3 at 59). She testified she never sought medical care as a result of an injury sustained from a fall. (ECF No. 12-3 at 60).

Spencer was then questioned by the ALJ:

Q Ms. Spencer, if you were given a job that did not require any lifting, or at least no lifting greater than say the weight of a mouse or a pen, and allowed you to sit when you wanted to sit, when your body required you to sit, and allowed you to stand up when your body felt it needed to stand up so long as you basically stayed at your desk area, could you do such a job that allowed you to take whatever physical posture, standing, sitting, as you needed? Could you do something like that?

A I actually shortly had a job like that as a sales rep for Verizon. I didn't have the job for very long because it was too stressful, but I did have a job like that.

Q When did you have this job?

A It was in 2018 for about a month.

Q And you said it was too stressful. That's why it ended?

A Yeah. I couldn't keep up with everyone, so they terminated me.

Q So, when you say you couldn't keep up was it because of your physical symptoms or was it because of something else? Was it just your speed wasn't up to what others' speed was?

A It was mostly -- because it was all with computers, and just keeping up with giving the customers what they needed on the computer, going through all the pages on the computer. Just keeping up with the flow of the computer. And I couldn't do it.

Q Okay. Other than keeping up with the flow of the computer -- had you been able to keep up with the computer, would there be any ether reason why you couldn't do that job again?

A Probably not because I couldn't sit for very long. Standing, I couldn't move very far from the desk and had to stay literally right by the computer because it had sensitive information on it. So--

Q What kind of sensitive information do you mean?

A Customer's Social Security Number, their address, their name --

Q Okay.

A -- all their personal information.

Q Okay. So, I want to be clear though. The reason the job ended was because of your speed, is that right?

A Yes. Like -- oh, I can't even think of the word. How I handled it, my anxiety, my stress got too much, and I would just panic. Customers weren't getting the help they needed, stuff wasn't getting done.

Q Okay. So, it was not because of your physical limits that the job ended or that the -- but your supervisors thought your performance was less than

1  what they wanted, is that right? It was your speed, correct? I just want to
2  make sure I understand.
   A That and my performance wasn't what they wanted. Like you said, my
3  performance.
   Q And your performance was related to speed, is that correct? Speed of
4  your functioning.
5  A Yes.
   Q -- of your use of the computer, is that right?
6  A Yes.
7  Q Okay. It did not have to do with any of your physical symptoms, is that
   fair?
8  A Yes.
9  Q If you were given a job that was a little less demanding on the
   computing, let's say you were given a job as a receptionist at an office
10 where you - so long as you stayed relatively close to your desk could stand
11 and sit as you wanted, do you think you could do something like that?
   A Physically, I probably could but with my anxiety -- I don't deal with
12 people very well. That, and most days I'm so nauseous I can't even get up
13 in the morning.
   ALJ: Counsel, I want to talk to you about this anxiety that your client has
14 now brought up. Is there any treatment record supportive of a severe
   impairment related to anxiety?
15 [MR. MACE]: I am not finding that. I did not write it down.
16 ALJ: Okay. I didn't see -- 2nd therefore, are you arguing a severe
   impairment of any kind related to mental impairments here?
17 [MR. MACE]: Actually, I do see a mention of anxiety at 1BF, 9.
18 ALJ: Okay, there's a mention of it. Is there regular, ongoing treatment that
   would substantiate finding it as a severe impairment based on this record?
19 [MR. MACE]: It says onset was November 3, 2021.
20 ALJ: Yeah, but does the record demonstrate ongoing, consistent care with
21 description of symptoms that would support application of limitations
   associated with it? There has to be a correlation between what she tells me
22 and what I see in the record so I'm just wondering if I missed something in
   the record. I didn't really -- that piece did not jump out at me in my review
23 as a really material part of this case.
24 [MR. MACE]: Well, I see also 2F, 11. There's a prescription for Sertraline
   for depression and anxiety.
25 ALJ: Okay.
   [MR. MACE]: It's 2F, 11.
26 ALJ: All right. And is there any indication that despite the prescription that
27 there are breakthrough symptoms of depression or anxiety that would
   justify application of any kind of vocational limitations?
28

[MR. MACE]: Well as you know, medical records rarely talk about function. They talk about symptoms. So, the answer is no.

ALJ: Are there discussions of symptoms breaking through despite the use of that prescription medication that could be reasonably read to interfere with work or concentration or anything like that?

[MR. MACE]: Well, it's listed as diagnoses assessment in several places but I'm not finding a specific functional limitation.

ALJ: What other questions do you have of your client?

BY ATTORNEY:

Q Meagan, the judge asked you whether you would be able to do a job if you were allowed to move as you wanted. However, when you were talking about sitting, you said that to relieve the numbness and tingling in your legs you needed to get up and move around for five minutes, correct?

A Yes.

Q Did I hear you correctly? So, if you were simply to stand at your workstation, your work desk, would that be enough to relieve the symptoms of numbness and tingling if you stood at the desk and didn't leave the workstation?

A I'd have to move around a little bit. Not very far but probably --

Q So, you would have to leave the workstation.

A Yeah, I'd still have to move around.

ALJ: Well, let's clarify what you mean by not very far and let's not lead with the questions here. So, you know, I have a workstation and it's a desk and there's a general vicinity of about three feet around my desk. If you needed to do that sit/stand, could you stay within those three or four square feet around your desk in order to--

CLMT: I believe so.

ALJ: I'm sorry, what did you say?

CLMT: I believe so.

ALJ: Okay. Continue, Counsel.

BY [Mr. Mace]:

Q So, if you were needing to reach and do things with your hand at the desk, if you moved three feet away would you still be able to do your work?

A I'd have to be within range but yeah.

Q All right.

(ECF No. 12-3 at 60-66).

The ALJ questioned the vocational expert ("VE") regarding Spencer's past relevant work. The VE noted Spencer had performed one job, i.e., customer service representative, from 2008 until 2018. (ECF No. 12-3 at 67). The VE classified that job as

performed at the sedentary exertional level with a skilled vocational preparation rating of 4. (*Id.*). The ALJ then questioned the VE as follows:

> ALJ: I'd like you to consider hypothetical number one. In hypothetical number one, please assume an individual the claimant's age, education, and past work. This individual is limited to the light exertional level. This individual can never work at unprotected heights or ladders, ropes, or scaffolds. individual perform any of the past work?
> A Yes, Your Honor, would be able to do past work as actually and generally performed.
> Q And is this consistent with the DOT [Dictionary of Occupational Titles]?
> A Yes.

(ECF No. 12-3 at 67-68).

> The ALJ then posed a second hypothetical to the VE:

> Please assume again an individual the claimant's age, education, and past work. This individual is limited to the sedentary exertional level. This individual should never work on ladders, ropes, or scaffolds, or at unprotected heights. This individual would require a sit/stand at will -- freedom to sit and stand at will. However, could generally remain in the workstation -- around the workstation, within a few feet, when oscillating between these two body positions …
> This individual needs to oscillate between sitting and standing say every 30 minutes of sitting would require five or less minutes of standing but could remain in the vicinity of the work station and stay --
> A Would they remain
> Q stay on-task.
> A on-task?
> Q And stay on-task, yes

> ***

> A [VE] …Generally, there are a lot of positions, especially in customer service, where individuals wear headsets so they're not actually lifting the phone.
> Q So, asking first, could the individual perform the past work here?
> A Yes, Your Honor. If they're remaining on-task while they're standing at the job site, they would be able to perform past work.
> Q Okay. As generally performed?
> A Both. As generally and actually performed.
> Q Okay. And in addition to the Customer Service Representative job, are there other jobs in the national economy that would be performable with this set of limitations as I've described?

> A Yes. Jobs in the sedentary that allow the individual to stand periodically if need[ed] but remain on-task would include the following. An Addresser. DOT 209.587-010. It is sedentary, SVP 2, unskilled, and that one has approximately 15,000. A second one would be that of a Document Preparer. []. It is sedentary, SVP 2. That one has approximately 40,000. And the third one would be a Telephone Information Clerk. DOT 237 … Telephone Information Clerk. … Sedentary, SVP 2. …

(ECF No. 12-3 at 68-71). The VE told the ALJ their answer to the second hypothetical was consistent with the DOT and they had also applied their "professional work experience to respond to the sit/stand, remaining on-task, having worked in the field for over 35 years and having placed people in these types of jobs." (ECF No. 12-3 at 70).

The ALJ also asked the VE:

> Q … Now if I were to modify the hypothetical two that I just gave you to say that the individual would experience off-task behavior of less than 10 percent owing to the sit/stand requirement or anything else, could the individual still perform the jobs you articulated? The past work as well as the other jobs.
> A The DOT does not reference off-task, Your Honor, but in my professional opinion I do not believe 10 percent off-task would impact employability so all jobs would remain.
> Q And is this consistent with the DOT?
> A No, Your Honor. I indicated the DOT does not reference off task.

(ECF No. 12-3 at 70-71).

Spencer's representative then questioned the VE:

> Q A[t] 12F and 20F, two medical providers said that Ms. Spencer would be able to stand and walk for a total of less than two hours total of an eight-hour workday. Would a hypothetical individual be able to do light or sedentary occupations with that restriction?
> A Well, the sedentary indicates that a person would be sitting for two hours. So, if you're saying that she's able to do less than two hours of sitting and six of standing –
> Q No, standing
> A -- and walking, that would be less than an eight-hour day so there would be no jobs.

(ECF No. 12-3 at 72).

1    In the decision denying benefits the ALJ determined Spencer's date last insured

2  for disability insurance benefits was June 30, 2021, and that Spencer had not engaged in

3  substantial gainful activity since the alleged onset date, i.e., October 21, 2020. (ECF No.

4  12-3 at 19). The ALJ determined Spencer had the severe impairments of postural

5  orthostatic tachycardia syndrome ("POTS"), small fiber neuropathy, degenerative disc

6  disease with radiculopathy, and migraine headaches. (*Id.*). The ALJ determined that there

7  was no impairment or combination of impairments that met or medically equaled the

8  severity of a listed impairment. (ECF No. 12-3 at 21).

9    The ALJ then determined Spencer had the residual functional capacity to perform

10  sedentary work with exceptions, i.e., she could "never climb ladders, ropes or scaffolds.

11  The claimant can never be exposed to unprotected heights. The claimant can sit/stand at

12  will, but she is able to remain on task. The claimant will be off task less than 10%." (ECF

13  No. 12-3 at 22).

14    Proceeding to the next step of the evaluation, the ALJ presented a comprehensive

15  review of the hearing testimony, including Spencer's statements regarding her ability to

16  perform a receptionist job, and concluded, *inter alia*:

17         After careful consideration of the evidence, the undersigned finds
           that the claimant's medically determinable impairments could reasonably
18         be expected to cause the alleged symptoms; however, the claimant's
           statements concerning the intensity, persistence and limiting effects of these
19         symptoms are not entirely consistent with the medical evidence and other
20         evidence in the record for the reasons explained in this decision.
           As for the claimant's statements about the intensity, persistence, and
21         limiting effects of his or her symptoms, they are inconsistent because the
22         medical evidence of record does not support the claimant's allegations.

23  (ECF No. 12-3 at 24).

24    The ALJ then thoroughly discussed the record medical evidence. (ECF No. 12-3

25  at 24-29). The ALJ also discussed the medical opinions of record, including the

26  persuasiveness of each opinion. (ECF No. 12-3 at 29-34).

27    The ALJ concluded: "Based on the foregoing, the undersigned finds the claimant

28  has the above residual functional capacity assessment, which is supported by the medical

1   evidence of record, supported medical opinion, testimony and other evidence considered

2   in this decision herein." (ECF No. 12-3 at 34). The ALJ further determined: "The

3   claimant is capable of performing past relevant work as a customer service

4   representative, DOT#249.362-026, which is sedentary exertional work with a SVP 4.

5   This work does not require the performance of work-related activities precluded by the

6   claimant's residual functional capacity." (*Id.*). The ALJ also found that there were other

7   jobs that Spencer could perform at the sedentary exertional level, with the additional

8   limitations included in the residual functional capacity, that exist in significant numbers

9   in the national economy, including addresser, document preparer, and telephone

10   information clerk. (ECF No. 12-3 at 35).  Accordingly, the ALJ concluded Spencer was

11   not disabled from October 21, 2020, through the date of the decision.

12          **V.      Analysis of Claims for Relief**

13          **A.      Symptom testimony**

14          Spencer contends the ALJ erred in discounting her subjective symptom testimony.

15   She asserts the ALJ did not consider the "majority of SSR 16-3p and 20 CFR 404.1529(c)

16   factors" and summarily discounted her testimony by stating: "as for the claimant's

17   statements about the intensity, persistence, and limiting effects of his or her symptoms,

18   they are inconsistent because the medical evidence of record does not support the

19   claimant's allegations." (ECF No. 16 at 9-15).[10]

20          When evaluating a claimant's symptom testimony, the Commissioner must engage

21   in a two-step analysis. The ALJ must determine whether the claimant presented objective

22   medical evidence of an impairment that could reasonably be expected to produce the

23   symptoms alleged. *See* 20 C.F.R. § 404.1529(b). If the claimant has presented such

24   evidence, the ALJ proceeds to consider all of the record evidence to determine the

25   _____

26          [10] In the opening and reply briefs Spencer's counsel emphasizes her depression was not
   properly addressed by the ALJ. However, at the hearing neither Spencer nor her representative

27   averred Spencer's depression impeded her ability to do work-related activities on a sustained
   basis. There are no psychiatric treatment records in the record on appeal.

28

persistence and intensity of the alleged symptoms. *Id.* § 404.1529(c). If there is no evidence the claimant is actually malingering, the ALJ may reject the claimant's symptom testimony by providing specific, clear, and convincing reasons which are supported by evidence in the record. *E.g.*, *Smith v. Kijakazi*, 14 F.4th 1108, 1112 (9th Cir. 2021).[11]

The Social Security disability statutes and regulations prohibit awarding benefits based solely on a claimant's subjective complaints. *See* 42 U.S.C. § 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. §§ 404.1529(a), 416.929(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is the ALJ's prerogative to "determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Treichler v. Commissioner of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). When a claimant establishes an underlying impairment, the ALJ must evaluate whether their symptom testimony is consistent with the objective medical evidence and the other evidence in the record. *See* 20 C.F.R. § 404.1529(c)(2)-(3); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). Although an ALJ must provide more than non-specific conclusions that a claimant's symptom testimony was inconsistent with their medical treatment, the ALJ is not required "to perform a line-by-line exegesis of the claimant's testimony …" *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020).

The ALJ concluded Spencer's symptom testimony was inconsistent with the record medical evidence. (ECF No. 12-3 at 24). Although the ALJ did not engage in an explicit analysis of each symptom described by Spencer and then address the specific record medical evidence contradicting Spencer's testimony regarding her symptoms, the ALJ did discuss the Spencer's hearing testimony and the entire medical record, which

---

[11] The "clear and convincing standard" applies only to cases within the jurisdiction of the Ninth Circuit Court of Appeals. *See* Stephen E. Smith, *Asking Too Much: The Ninth Circuit's Erroneous Review of Social Security Disability Determinations*, 26 Lewis & Clark L. Rev. 229, 233-34 (2002).

record included substantial evidence contradicting Spencer's testimony regarding the severity and persistence of her symptoms.

For example, Spencer testified that she experienced migraine headaches several times per month and that "nothing" except lying in a dark room helped the migraine pain. However, in the record on appeal Spencer reported to her physicians that her medication alleviated the pain and the frequency of the migraines, and that during much the relevant time period she experienced only one migraine per month, and that she had gone several months without a migraine after starting the medication. The ALJ noted Spencer's postural orthostatic tachycardia syndrome ("POTS") symptoms were under control with medication and her migraines abated with medication. The type and effectiveness of treatment are factors the ALJ may consider when evaluating allegations regarding the severity of a claimant's symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v). "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Commissioner of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

The ALJ presented a thorough and detailed summary of Spencer's hearing testimony, noting Spencer averred she could perform a job similar to the one she performed at Verizon, with less stressful requirements, which allowed her to sit and stand when needed. The ALJ provided sufficient support for a residual functional capacity of only sedentary work with additional limitations, including a sit and stand at will option to accommodate the limitations of small fiber neuropathy symptoms to which Spencer testified. In the assessed residual functional capacity the ALJ provided limitations based on Spencer's testimony with regard to both POTS and small fiber neuropathy.

The ALJ did not reject all of Spencer's symptom testimony, and did not reject some testimony solely on the basis that the statements were not supported by objective medical evidence. Notably, the ALJ rejected the symptom testimony presented at the hearing primarily because it was contradicted not only by *objective* medical evidence, but also by Spencer's own statements to her physicians. The ALJ properly considered

Spencer's reports to her physicians that she was able to independently perform activities of daily living. Spencer maintains the ALJ did not discuss specific activities that contradicted her testimony. Nonetheless, the ALJ adopted a level of activity and limitation in accordance with Spencer's own hearing testimony. The ALJ incorporated Spencer's testimony, regarding how often she could sit at once time before needing to stand and massage her legs, into the residual functional capacity. Spencer testified that moving or walking did not completely relieve numbness and tingling, but did provide enough relief to allow her to continue functioning. She testified that her physical limitations would not preclude her from being able to perform a job similar to that of her prior work as a customer service representative, if she were able to sit and stand at will and the job involved less stress.[12]

Additionally, any error with regard to the ALJ's failure to identify specific symptom testimony and then pinpoint in the record where that testimony was contradicted was harmless because the entire record on appeal, including Spencer's hearing testimony, indicates that Spencer's symptom testimony was not supported by the objective medical evidence, Spencer's statements to her physicians, her reports of her activities of daily living and functional capacity to her physicians, and the notes of her physical examinations. Even when the ALJ commits legal error, their decision must be upheld when that error is harmless, i.e., when the error "is inconsequential to the ultimate nondisability determination," and "the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity." *Treichler*, 775 F.3d at 1099. *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015); *King v.*

---

[12] Spencer testified that anxiety would preclude her from this work, but at the hearing Mr. Mace allowed that she did not report disabling anxiety to her physicians and she did not seek psychiatric treatment, and any anxiety appeared to be well-controlled on medication. In the decision denying benefits the ALJ noted Spencer declined to participate in recommended psychotherapy and counseling, and that a consulting psychiatrist and several treating physicians found no psychiatric issues. (ECF No. 12-3 at 20). Spencer also testified that she could not maintain a work schedule because she was nauseated every morning, an allegation that is not supported by the record nor does she raise an allegation that her nausea was completely disabling in this appeal.

*Commissioner of Soc. Sec. Admin.*, 2020 WL 5587429, at *2 (D. Ariz. Sept. 18, 2020). "The standard isn't whether [the] court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). The ALJ's conclusion regarding Spencer's symptom testimony was a rational interpretation of the record and when the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the Court must uphold the ALJ's decision. *E.g. Ahearn v. Saul*, 988 F.3d 1111, 1115-16 (9th Cir. 2021), *citing Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); *Trevizo*, 871 F.3d at 674-75. Any error with regard to the consideration of all factors stated in Social Security Ruling 16-3p was harmless because the entire record indicates Spencer's symptoms were not as severe and incapacitating as she alleged. That the ALJ did not discuss Social Security Ruling 16-3p or each and all of the elements found in that guidance does not require remand. *See*, *e.g.*, *Olivas v. Commissioner of Soc. Sec. Admin.*, 2023 WL 3749568, at *4 (D. Ariz. June 1, 2023); *Sfetku v. Commissioner of Soc. Sec. Admin*, 2019 WL 92499, at *5-6 (D. Ariz. Jan. 3, 2019). The ALJ's conclusion with regard to Spencer's symptom testimony and her residual functional capacity was rational and supported by sufficient evidence from which a reasonable mind could find in favor of the ALJ's determination.

## B.    Medical Opinion Evidence

Spencer contends the ALJ erred in weighing the medical source opinions. Spencer argues:

> As to the opinion of Dr. Maryanne Belton, PsyD., the ALJ found that the opinion was "somewhat persuasive". (R. 28). As rationale for the diminishment of the opinion, the ALJ found that she examined Spencer on a single occasion and was not a treating source. (R. 29). This is certainly not a clear and convincing reason. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Under the same logic, the Agency opinion of Dr. Penner whom the ALJ afforded persuasive weight never treated or examined Spencer and is not a treating physician. (R. 29, 33). Moreover, Spencer's pain symptoms and accompanying physical ailments did not stabilize; they are noted to "deteriorate". (R. 29, 609-10). The ALJ found the opinion of Dr. Winter to be "somewhat persuasive" as the ALJ presumes medical

improvement by 2022 regarding POTS. (R. 30-31). First, the record only stated at that visit her symptoms were "mostly" under control. (R. 685). Her pulse related symptoms were "mostly" under control. (R. 685). Second, even if the ALJ were correct regarding any improvement, the ALJ has not explained why between 2020 and 2021, Dr. Winter's opinion was not consistent with the record. (R. 31). Third, records thereafter confirm ongoing issues with shortness of breath on exertion, daytime cough and an abnormal pulmonary function test. (R. 636-37).

As to Amanda Berg, PA, an ALJ's decision to discredit any medical opinion must be supported by substantial evidence. ….

(ECF No. 16 at 16-17). .

With regard to an ALJ's evaluation of medical source opinions, the relevant analysis changed in 2017. Under the old regulations, the ALJ was required to apply a hierarchy to the sources of medical opinions, i.e., the opinion of a treating physician was given more weight than an examining physician, and a non-treating, non-examining physician's opinion was given less weight than that of an examining or treating physician. *E.g.*, *Tommasetti*, 533 F.3d at 1041.

In *Woods v. Kijakazi*, the Ninth Circuit held revised regulations supplanted the prior "treating physician rule." 32 F.4th at 791-92. The Ninth Circuit noted that, under the revised regulations, "there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa." *Id.* at 791, *quoting* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-85 (Jan. 18, 2017), *available at* 2017 WL 168819. The Ninth Circuit held the prior requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion was incompatible with the revised regulations. *Id.* at 792. Pursuant to the holding in *Woods*, an ALJ "must 'articulate ... how persuasive' it finds 'all of the medical opinions' from each doctor or other source, and 'explain how it considered the supportability and consistency factors' in reaching these findings." *Id.*

The new regulations provide the Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion." 20 C.F.R. § 404.1520c(a). In determining whether an opinion is "persuasive," the ALJ considers

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 404.152c(c)(1)-(c)(5). The "most important factors" the Commissioner considers when evaluating "the persuasiveness of medical opinions ... are supportability ... and consistency." 20 C.F.R. § 404.1520c(a). The ALJ considers and "may," but is not "required" to, explain the other factors.

The ALJ found Dr. Belton's opinion to be somewhat persuasive. The ALJ determined the finding of depression was consistent with medical evidence of record and was somewhat supported by Dr. Belton's examination. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). However, the ALJ noted support for this opinion was "somewhat eroded" because Dr. Belton examined Plaintiff only a single time. Spencer contends the length of the treating relationship was not a sufficient reason to find this opinion less persuasive. However, as stated in 20 C.F.R. § 404.152c(c), the length and nature of Dr. Belton's medical relationship with Spencer was a legitimate consideration. Additionally, this was not the only reason the ALJ found Dr. Belton's opinion only somewhat persuasive. The ALJ properly addressed and discussed the factors of supportability and consistency when examining all of the medical sources' opinions. The new regulations require only specific findings regarding the factors of supportability and consistency, and an ALJ is permitted to, although not required to, discuss other factors. Although the ALJ was not required to discuss the medical relationship, the ALJ to was allowed to consider this issue when determining what weight to give a physician's opinion.

Additionally, Dr. Belton did not opine as to any limitations and accordingly, Dr. Belton did not specify any limitations which the ALJ rejected that would affect the assessed residual functional capacity. Furthermore, as Defendant notes, Spencer does not challenge any of the ALJ's findings regarding her mental impairments with regard to the finding that she did not have any severe mental impairments and when assessing her residual functional capacity, and she has therefore waived any challenge to the ALJ's determination of her residual functional capacity as to mental health limitations. *See Bray*

*v. Astrue*, 554 F.3d 1219, 1226 n.7 (9th Cir. 2009) ("This argument, however, was not made in [claimant's] opening brief; thus, we deem it waived").

With regard to Dr. Winter's opinion, which the ALJ found somewhat persuasive, the ALJ noted that after Dr. Winter authored this opinion in June of 2021, Spencer's POTS symptoms were improved by medication. The record on appeal indicates that xix months after Dr. Winter offered his opinion Spencer reported doing well, and she denied lightheadedness, dizziness, fainting, or falls. The ALJ also made allowances in the residual functional capacity for Spencer's POTS symptoms, i.e., limiting her to sedentary work with a sit/stand option and precluding her from work requiring climbing or other postural activities. Also notably, at the hearing Spencer herself stated that her primary hindrance to working was small fiber neuropathy with the attendant symptom of tingling and discomfort in her hands and legs, not the symptoms of POTS.

With regard to Spencer's assertion that the ALJ improperly evaluated PA Berg's assessment, the weight of the record evidence does not support the specific limitations assessed by PA Berg which the ALJ rejected. Spencer contends the ALJ "barely" addressed her limitations due to small fiber neuropathy, but the ALJ did detail and discuss Spencer's pain-related impairments when assessing her symptom allegations. Furthermore, the entire record does not support a complete bar on postural activities in the residual functional capacity. *Inter alia*, the ALJ observed Spencer reported an ability to dress and conduct personal hygiene activities, prepare meals, and do household chores unassisted. A review of the entire record on appeal and the lengthy opinion of the ALJ does not bely the ALJ's conclusion with regard to the opinion offered by PA Berg as to Spencer's residual functional capacity. *See  Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022) (noting the reviewing court must consider the ALJ's entire decision when determining whether substantial evidence supports that decision).

Finally, the ALJ included many restrictions in the assessed residual functional capacity which account for Spencer's own testimony regarding the limitations caused by her symptoms, such as limiting her to sedentary work with numerous environmental and

various postural imitations, with an option to sit and stand at will. The sit/stand option was in accordance with PA Berg's opinion that Spencer must periodically sit and stand to relieve pain and discomfort.

Additionally, when the record evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Shaibi*, 883 F.3d at 1108 (internal quotations omitted). And, if an ALJ's legal error was harmless, i.e., if there is substantial evidence in the record to support the ALJ's conclusion on the challenged issue absent the legal error, the case need not be remanded for further proceedings. *See*, *e.g.*, *Ford*, 950 F.3d at 1154; *Zavalin*, 778 F.3d at 845. An error is harmless if "it was inconsequential to the ultimate nondisability determination." *Ford*, 950 F.3d at 1154 (internal quotations omitted). A thorough review of the entire record on appeal reveals substantial evidence supporting the ALJ's evaluation of the medical source opinions and the ALJ's compilation of Spencer's residual functional capacity. The ALJ's conclusion was a rational interpretation of the record, and any legal error in the ALJ's written opinion addressing the medical source opinions was harmless.

Spencer's argument that the ALJ acted as a medical expert does not provide a sound basis for rejecting the ALJ's decision. The ALJ accepted the diagnoses of Spencer's physicians and considered Spencer's symptom testimony in light of the entire record, including Spencer's own reports to her physicians that her migraine headaches had responded to medication and that her POTS symptoms were manageable. The ALJ performed the task assigned by the Social Security regulations, and the residual functional capacity assessed by the ALJ was supported by those portions of medical sources' opinions that were in turn supported by the provider's own treatment notes. The ALJ's decision was also supported by Spencer's statements to her medical care providers and her hearing testimony; the ALJ did not impermissibly make their own medical findings, but instead incorporated the objective medical evidence and other record evidence, including Spencer's hearing testimony, into a residual functional capacity with regard to specific work-related activities. *See Bischoff v. Kijakazi*, 2023 WL 5319251,

at *1 (9th Cir. Aug. 18, 2023). The "ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Commissioner of Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). *See also* 20 C.F.R. § 404.1529(a) (providing the ALJ must "determine the extent to which [a claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [her] symptoms affect [her] ability to work."); *Cady v. Kijakazi*, 2023 WL 6937407, at *1 (9th Cir. Oct. 20, 2023); *Carl v. Commissioner of Soc. Sec. Admin.*, 2023 WL 6532753, at *4 (D. Ariz. Oct. 6, 2023); *Labine v. Commissioner of Soc. Sec. Admin.*, 2020 WL 6707822, at *4 (D. Ariz. Nov. 16, 2020) (stating the regulations require the ALJ to assess the residual functional capacity based on relevant medical and other evidence, and to evaluate the support an opinion has on objective medical evidence and the record as a whole, and concluding "[t]he discharge of these regulatory duties is not tantamount to rendering a medical opinion."), *citing Landeros Zamora v. Commissioner of Soc. Sec. Admin.*, 2020 WL 5810060, at *5 n.8 (D. Ariz. Sept. 30, 2020) (rejecting the same argument); *Schott v. Commissioner of Soc. Sec.*, 2019 WL 5782324, at *5 (D. Ariz. Nov. 6, 2019) ("Plaintiff, however, contends that the ALJ is 'not qualified, as an administrative adjudicator, to provide an independent analysis of medical evidence, that is, decide on her own that there were insufficient findings in this record to support the treating physician's opinion.' … The Court agrees with Defendant that it is precisely the ALJ's job …"). The Ninth Circuit has opined that "ALJs are, at some level, capable of independently reviewing and forming conclusions about medical evidence to discharge their statutory duty to determine whether a claimant is disabled and cannot work." *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022).

### C.   Step Four and Five Determination

Spencer contends: "The ALJ's Step Four and Five Determination is Not Supported by Substantial Evidence Or at a Minimum, There is an Obvious Conflict." (ECF No. 16 at 20). She asserts "the ALJ must compare the claimant's RFC with the physical and

mental demands of the past relevant work to determine whether the RFC would permit a return to the claimant's past occupation." (ECF No. 16 at 20-21). Spencer argues: "When there is an apparent conflict between the VE's testimony and the DOT, the ALJ must elicit a reasonable explanation for the conflict from the VE before relying on the VE's testimony to support a determination or decision about whether the claimant is disabled." (ECF No. 16 at 21). Spencer maintains:

> In this case, the VE was specifically asked about the sit/stand option at will to which the VE stated "your honor I need clarification. Can you quantify the sit/stand? Would it be like, I mean, at will. I don't necessarily believe there's a job that allows sit/stand at will". (R. 68). Despite this testimony, the ALJ concluded in the RFC that Spencer could perform the RFC of "sit/stand at will but she is to remain on tasks", directly contradicting the VE's testimony that this would not allow for jobs. (R. 21, 68). In fact, the clarification was for oscillating between sitting and standing every 30 minutes and would require five minutes or less of standing but would remain on task. (R. 68). This was not the RFC adopted by the ALJ and per the VE's own testimony, there are no jobs under the ALJ's RFC. For these reasons, the testimony by the VE was clearly an obvious conflict and it was not reconciled by the ALJ either at the hearing or in the decision warranting remand.

(ECF No. 16 at 22).

This is not an accurate rendition of what occurred during the hearing. The ALJ established, through the VE's testimony, that the residual functional capacity assessed by the ALJ would allow Spencer to perform her past relevant work both as specified in the DOT and as actually performed. The actual colloquy between the ALJ and the VE indicates Spencer could perform her past relevant work, which would allow for a sit/stand option within Spencer's abilities, as she herself testified, and that Spencer could perform sedentary work available in the national economy.

Spencer's argument misconstrues portions of the hearing transcript and the VE's testimony. In response to the VE's question the ALJ clarified what was meant by "at will." (ECF No. 12-3 at 69). After that clarification the VE testified there was work available that Spencer could perform given her residual functional capacity. (ECF No.

12-3 at 70). The ALJ explicitly stated that the "at will" sit/stand option included remaining on task, and the VE opined that "[i]f they're remaining on task while they're standing at the job site, they would be able to perform past work" (ECF No. 12-3 at 69-70). The vocational expert testified that they applied their experience of more than 35 years in the field, placing people in the types of jobs they testified to, regarding the sit/stand option and remaining on task. (ECF No. 12-3 at 71). Absent indications of unreliability, a vocational expert's testimony is per se substantial evidence supporting an ALJ's conclusion at the fourth and fifth steps of the sequential evaluation. *See*, *e.g.*, *White v. Kijakazi*, 44 F.4th 828, 833-34 (9th Cir. 2022); *Ford*, 950 F.3d at 1159-60; *Moore v. Apfel*, 216 F.3d 864, 869-70 (9th Cir. 2000). And any error with regard to the ALJ's conclusion that Spencer could perform her past relevant work would be deemed harmless by the finding, based on Spencer's hearing testimony and the VE's testimony, that Spencer could perform different work available in the national economy given a sedentary exertional level, a SVP of 2, and a sit/stand at will option.

## VI.    Conclusion

The Ninth Circuit Court of Appeals has recognized that the threshold for substantial evidentiary sufficiency is "not high," and the Court must uphold an ALJ's conclusion if the evidence is susceptible to more than one rational interpretation. The ALJ's decision in this matter regarding disability is reasonable, free of harmful legal error, and supported by substantial record evidence and therefore the ALJ's decision should be affirmed.

Accordingly,

**IT IS RECOMMENDED that** the decision of the Commissioner denying claims for disability-based benefits be **affirmed**, and that the Complaint be dismissed with prejudice.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. Pursuant to Rule 7.2(e)(3) of the Local Rules of Civil Procedure for the United States District Court for the District of Arizona, objections to the Report and Recommendation may not exceed ten (10) pages in length. Failure to timely file objections to any factual or legal determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo appellate consideration of the issues. *See United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 23rd day of May, 2024.

Camille D. Bibles
United States Magistrate Judge